John F. Scileppi, J.
Plaintiff sues his wife to impress a trust on one half of $8,890 which she withdrew from a joint savings account. Defendant counterclaims for a separation. By previous order of this court the counterclaim was tried separately but simultaneously with the action to impress a trust. The parties stipulated that the proof adduced on the plaintiff’s cause of action which was pertinent and relevant to the issues on the counterclaim could be considered by the court as proof in the latter, without again offering such proof. This decision disposes of both causes of action.
The material facts as found by the court are as follows: The parties herein were married in Hoboken, New Jersey, on June *86 16, 1946. There are no children of this marriage. In 1946, before the parties were married, the defendant had a savings bank account in her name in the Hudson Trust Company in Hoboken. After she married the plaintiff, she converted it into a joint savings account in the name of plaintiff and herself which read to “ either or survivor.” The parties lived in New Jersey until October, 1947 when they moved to Jackson Heights, New York. The New Jersey account was continued until January 17, 1950, when a new similar joint savings account was opened in both names in the Long Island City Savings Bank in Queens County. The initial deposit amounted to $119, which was money transferred from the New Jersey bank.
At the time plaintiff married the defendant he had no assets. The defendant, however, at the time of the marriage owned more than $5,000 in United States Savings Bonds and had other moneys of her own.
Both plaintiff and defendant were employed before they were married and continued their respective employments thereafter. In 1951 plaintiff’s regular employment terminated and defendant made available to him moneys from the joint savings account to set him up in business on two separate occasions: once in a cigar stand business; another time in a book business. Each of these ventures lasted only several months and was not successful. When the "businesses were sold, the amounts salvaged were deposited in the joint savings account.
It appears that from 1946 to 1953 inclusive the plaintiff’s earnings averaged approximately $55 per week when employed. From about the middle of 1951 to March of 1953 his employment was no longer steady. In March, 1953, he obtained employment as an elevator operator with the department of hospitals of the City of New York at a starting salary of $2,010 per year and at the time of the trial his take-home pay was approximately $37 a week.
The defendant, who is 54 years of age and now in poor health, has been steadily employed with one firm for 39 years. At the time she married the plaintiff she was earning approximately $48 per week and as of the date of trial received take-home pay of about $56 per week. In addition to her salary, and since her marriage to plaintiff, the defendant received other sums from the proceeds of a life insurance policy when her mother died, a paid-up insurance policy on her own life and a mortgage on real estate, all of which totalled approximately $3,000. It was the practice of the parties, while living as husband and wife, to cash their salary checks and to pay their current household *87 expenses out of the proceeds. Their salaries were commingled and part of the salaries of each, after defraying such expenses and personal expenses, went into a joint checking account, from which were paid other household expenses. Some of their salaries went into the joint savings account. There is no proof, however, as to how much was deposited from their respective salaries in either the savings account or the checking account. There is no doubt that the salaries of both plaintiff and defendant were used for their mutual benefit. There is no proof, however, as to the exact amounts expended by each for specific purposes.
The defendant used the funds in the savings account as she wished, although she did confer with the plaintiff before doing so. She made loans to relatives, which were repaid, withdrew moneys for household furnishings and purchased a 1949 Oldsmobile for family use.
In March of 1953, when the plaintiff became employed with the department of hospitals of the City of New York, he was placed on the night shift. (The defendant worked during the day.) At first he normally arrived home from work at or about midnight or 12:30 a.m. Originally, too, he was off from his employment one day a week. In April or May of 1953, however, he was off two days per week, but led the defendant to believe that he was still only off one day per week. The plaintiff often used the family car to go to work. After May of 1953 he frequently came home at 3:00 or 4:00 a.m., and on at least one occasion, at 7:00 a.m.
The defendant justifiably became suspicious of the plaintiff’s conduct. When defendant asked plaintiff why he was arriving home so late, the plaintiff refused to discuss the situation, thus causing considerable tension and friction between the parties. In December of 1953 the defendant insisted on knowing what he was doing out so late and so frequently. The plaintiff, however, refused to give any explanation. During the months of December, 1953, and January, 1954, the defendant saw very little of the plaintiff. On January 11, 1954, plaintiff arrived home at or about 4:00 a.m. and the defendant told him that she could not continue to go on that way and wanted to know why he was acting as he was. The plaintiff told her not to ask any questions. Later that day, when defendant arrived home, she discovered that plaintiff had left and had taken with him all of his personal belongings as well as the Oldsmobile purchased in plaintiff’s name with funds drawn out of the joint savings account. The plaintiff left without in any way notifying the *88 defendant. On the same day the defendant withdrew from the joint savings account in the Long Island City Savings Bank the sum of $8,890.
The following day plaintiff telephoned the defendant who pleaded with him to return. He saw her the next day and they discussed the situation. Again defendant pleaded with him to return. Blaintiff advised her that he would sometime, but not until later. He never returned. The plaintiff has paid nothing towards defendant’s support since January 11, 1954.
It is significant that although the savings bankbook was, to the knowledge of the plaintiff, kept in the dresser drawer where he kept some of his personal effects, he did not take it with him when he left. When plaintiff returned to see the defendant on January 13, he made no claim for any share of the money in the savings account. Indeed, he never made any such claim until this action was started in December, 1954. He never attempted to stop payment on the joint savings account, nor did he, in his letter to the defendant, dated July 19, 1954, make any claim or even refer to the money on deposit in the savings account.
The court finds that virtually all of the funds in the savings bank account in question came from the defendant’s income and from the proceeds of the sale of most of her United States Savings Bonds, as well as the moneys she received from life insurance policies and a mortgage. This fact, as well as the conduct of the parties, overcomes any presumption that the plaintiff had a monetary interest in the joint savings bank account in question. (Banking Law, § 239, subd. 3; Stevens v. Stevens, 4 Mise 2d 27, affd. 281 App. Div. 816.) In any event the plaintiff failed to show how much of the money in that account was deposited from his earnings or assets.
Although the plaintiff contends that the defendant agreed on two separate occasions, once before the parties were married and again thereafter, to give him an equal share in all the property she owned, including moneys in the savings account, the court finds that no such agreement was ever made. It appears that this joint account was maintained as a matter of convenience only, defendant intending that in the event of her death the money would be paid to plaintiff. The manner in which she exercised the use of the savings account showed that she had the dominant control thereof consistent with her contention that all the money therein belonged to her.
In view of the foregoing, on plaintiff’s cause of action judgment is rendered in favor of the defendant dismissing the complaint on the merits, with costs.
*89 On defendant’s counterclaim for a separation, the court finds that plaintiff abandoned defendant without justifiable cause. Accordingly, judgment is rendered in favor of defendant and plaintiff is directed to pay to her for her maintenance and support the sum of $10 per week, commencing January 24, 1956, and a counsel fee in the sum of $300.
This constitutes the decision of the court, pursuant to section 440 of the Civil Practice Act.
Submit judgment.